**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Interstate Fire and Casualty Company, | No. CV-12-01237-PHX-DGC |
| Plaintiff, | **ORDER** |
| v. | |
| New Hampshire Insurance Company, | |
| Defendant. | |

Plaintiff Interstate Fire and Casualty Company ("Interstate") has filed a motion for summary judgment.  Doc. 90.  Defendant New Hampshire Insurance Company ("New Hampshire") has filed a cross-motion for summary judgment.  Doc. 92.  The motions are fully briefed.  Docs. 93-95, 98.  The Court will grant New Hampshire's motion and deny Interstate's motion on the basis of the employment exclusion clause.  The Court expended substantial time analyzing the myriad issues in this case before ultimately concluding that the employment exclusion is dispositive.  Because of the likelihood of appellate review, and in the interest of judicial economy, the Court will include its analysis of all issues in this order.[1]

I.     **Background.**

New Hampshire issued insurance policy number 01-LX-089199474-1/000 to Knochel Brother's Inc. ("Knochel"), effective from March 12, 2009 to March 12, 2010.  Doc. 92-2 ¶ 9.  Knochel is a grading contractor based in Arizona.  Doc. 92-2 ¶ 1, 9.  As

---

[1] The request for oral argument is denied because the issues have been fully briefed and oral argument will not aid the Court's decision.  *See* Fed. R. Civ. P. 78(b); *Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998).

part of its business, Knochel frequently rents watering equipment from Water Movers, Inc. ("Water Movers").  Doc. 93-1 ¶ 2.

Sometime before March 31, 2009, Knochel asked Water Movers to deliver and install a water pump and load station to fill water trucks from a pond located at a job site near Florence, Arizona.  Doc. 92-2 ¶ 12.  On March 31, 2009, Water Movers responded by faxing an estimate to Knochel.  *Id.* ¶ 13; Doc. 90-3 at 10-13.  Knochel reviewed the estimate and verbally requested that the work be performed.  Doc. 92-2 ¶ 14.  Water Movers installed the equipment on April 1, 2009.  *Id.* ¶ 17.

At approximately 6:30 a.m. on April 2, 2009, an employee of Knochel, Duane Brown, suffered an injury while working with the Water Movers equipment.  *Id.* ¶ 19.  Approximately four hours after the injury, Water Movers faxed Knochel a document captioned "rental contract" and a load safety procedures document.  *Id.* ¶ 20.

As a result of the accident, Mr. Brown sued Water Movers for negligence.  *Id.* ¶ 25.  The suit was settled when Interstate – Water Movers' insurer – paid a settlement and defense costs.  Based on provisions contained in the alleged rental contract, Interstate maintains that Knochel was contractually obligated to add Water Movers to its New Hampshire insurance policy as an additional insured.  Interstate alleges that New Hampshire has a duty to indemnify Interstate for the cost of defense and the settlement.

## II.    Legal Standard.

A party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Summary judgment is also appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at

1    trial." *Celotex*, 477 U.S. at 322.  Only disputes over facts that might affect the outcome

2    of the suit will preclude the entry of summary judgment, and the disputed evidence must

3    be "such that a reasonable jury could return a verdict for the nonmoving party."

4    *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

5    **III.    Analysis.**

6              In Arizona, an enforceable contract requires an offer, acceptance, consideration,

7    and sufficient specification of terms so that the obligations involved can be ascertained.

8    *Savoca Masonry Company, Inc. v. Homes and Son Construction Co., Inc.*, 543 P.2d 817

9    (Ariz. 1975).  Each of Interstate's claims is predicated on the assertion that a valid written

10   contract exists between Interstate and Knochel, in which Knochel agreed to add Water

11   Movers as an additional insured to the New Hampshire policy.

12             **A.    New Hampshire Policy.**

13             Knochel's New Hampshire insurance policy includes three endorsements that

14   define additional insureds under the policy.  Doc. 92-2 ¶¶ 9-11 (citing Doc. 92-5 at 55,

15   65, 81); *see also* Doc. 90-4 at 117, 127, 143.  Two of the endorsements include charts

16   listing the names of additional-insured persons or organizations, and the only entry on the

17   chart is "BLANKET – WHERE REQUIRED BY WRITTEN CONTRACT."  Doc. 92-5

18   at 55, 65 (capitalization in original).  The final endorsement states that an additional

19   insured is "any person or organization for whom you are performing operations when you

20   and such person or organization have agreed in writing in a contract or agreement that

21   such person or organization be added as an additional insured on your policy."  *Id*. at 81.

22   All of the endorsements list further exclusions, stating that a party that qualifies is only an

23   additional insured "with respect to liability for 'bodily injury', 'property damage' or

24   'personal and advertising injury' that is caused by your acts or omissions or [t]he acts or

25   omissions of those acting on your behalf, in the performance of your ongoing operations

26   for the additional insured."  *Id*.

27             By the terms of policy's endorsements, Water Movers can claim to be an

28   additional insured only if it was "required by a *written* contract" or Knochel had "agreed

*in writing* in a contract or agreement that [Water Movers] be added as an additional insured on the policy." *Id.* at 55, 65, 81 (emphasis added). Interstate claims that Water Movers entered into a written contract with Knochel sufficient to satisfy this requirement.

**B.   Documents Allegedly Constituting a Written Agreement.**

Interstate claims that Water Movers ordinarily requires a customer's signature on a rental agreement upon delivery. Doc. 90-12 ¶ 12. Because of its long-standing relationship with Knochel, however, Water Movers agreed to deliver equipment when no Knochel representative was present, and to obtain a signature on the "rental inventory," which allegedly contained the terms and conditions of the rental contract, at a later date. Doc. 93 at 7; Doc. 93-12 ¶ 18. Interstate insists that Knochel and Water Movers entered into a written agreement, and it variously refers to the agreement as "Rental Equipment Estimate and Rental Inventory/Contract" and "Equipment Rental Contract No. 16372." Doc. 92 at 5-7. As the compound name suggests, Interstate appears to argue that both the initial rental equipment estimate and later rental inventory sheets are all part of the same written instrument, and that they "form[] a written contract that was signed and entered into by the parties." Doc. 92 at 7 (citing Doc. 90-2 ¶ 3).

The Court finds no support for the theory that the estimate and later inventories all form a single contract. None of the documents purports to be an addendum to a previous contract. Instead, each document includes the equipment to be delivered at the time it is executed, the price of that equipment, and a line for a signature and date. The initial estimate and the subsequent documents contain different terms and were transmitted to Knochel under different circumstances and at different times. In light of these facts, the Court will consider each of these documents individually to determine whether any of them could constitute a written agreement that would require Knochel to add Water Movers as an additional insured on the New Hampshire policy.

**1.   Faxed Estimate.**

As noted above, Knochel first contacted Water Movers by phone to request services. Water Movers faxed Knochel an estimate for the requested equipment and

installation.  Doc. 90-3 at 10-13.  Interstate claims that the faxed document set out the terms of the contract between Knochel and Water Movers.  The second page of the document states that the "Customer [Knochel] agrees to abide by the terms and conditions on the purchase or rental contract."  *Id*. at 12.  The "terms and conditions" referenced is a list of terms that appears on the back of Water Movers standard estimate form.  Doc. 90-3 at 16.  Item number thirteen provides that "Water Movers, Inc., its officers, directors, members, managers, employees, shareholders, and affiliates must be named as an additional insured" on Knochel's insurance coverage.  *Id*.  The estimate was faxed to Knochel on March 31, 2009, but only the front side of each page was transmitted.  Doc. 90-3 at 10-13.  It appears that this was the only document to change hands before installation of the equipment on April 1, 2009, and the accident on the morning of April 2, 2009.  Doc. 92-2 ¶ 19.

While the faxed estimate memorializes some of the terms of an agreement between Knochel and Water Movers, it simply is not a written agreement sufficient to trigger the additional-insured coverage in the New Hampshire policy endorsements.  The estimate contained a list of the equipment that would be installed and a quoted price, but it referenced "terms and conditions" that were not actually contained in the transmitted copy.  More importantly, the document was not signed.  An unsigned and incomplete writing is not a written agreement.  Any agreement related to the estimate was oral in nature, and as such was insufficient to trigger the additional-insured coverage in Knochel's New Hampshire insurance policy.

### 2.     April 2 Fax.

On April 2, 2009, at approximately 9:53 a.m., Water Movers faxed several more documents to Knochel.  Doc. 90-3 at 25-27.  The first lists the rented equipment that Water Movers installed on April 1, 2009.  *Id*. at 26.  It appears to be Water Movers' standard "equipment rental contract," and it contains a notation that it is subject to the terms and conditions on the reverse side.  The notation is barely legible, and it does not appear that the reverse side was transmitted as part of the fax.  *Id*.  The second document

is a form entitled "Load Stands Installation and Safety Procedures."  *Id*. at 27.  Both forms include signature lines, but both documents are unsigned.  *Id*. at 26-27.  Like the initial estimate, these documents are incomplete and unsigned.  They do not constitute written agreements.

### 3.  April 2 Forms.

Interstate alleges that two additional documents, both dated April 2, 2009, constitute written agreements.  *Id*. at 28-32.  These documents are similar to the forms that were faxed on April 2 – a rental agreement document (*id*. at 29-30) and a load stands installation and safety procedures document (*id*. at 32) – but unlike the other documents to which Interstate points, these were signed by a Knochel representative.  It also appears that the terms and conditions on the backside of the rental agreement were actually present before the Knochel employee signed the document.  *Id*. at 30.  These documents are sufficiently specific to form an enforceable agreement and, because they are signed, they are also written agreements that satisfy the requirements for an additional insured under the New Hampshire policy endorsements.

Notably, these documents were not signed until after the accident that gave rise to liability.  New Hampshire contends that the April 2 written agreement was prospective only, and that adding Water Movers as an additional insured could not give rise to an obligation to indemnify Interstate for an accident that occurred before the contract was executed.

Part I of the "Commercial General Liability" section of the New Hampshire Policy contains an exclusion which states that when Knochel is "obligated to pay damages by reason of the assumption of liability in a contract or agreement," damages will only be covered by the insurance when "the 'bodily injury' or 'property damage' occurs subsequent to the execution of the contract or agreement."  Doc. 90-4 at 101.  Under the facts of this case, however, Knochel has not assumed liability by contract or agreement, but rather agreed in writing to add Water Movers as an additional insured to the New Hampshire policy.

All three endorsements that allow Knochel to add additional insureds purport to modify Part II of the "Commercial General Liability" section of the policy. *Id*. at 117, 127, 143. Each contains several conditions that must be satisfied before a third party may be added as an additional insured, such as a written contract, but none contains an exclusion that limits additional-insured status to incidents that occur after the execution of an additional-insured agreement. *Id*. Furthermore, that such an exclusion was included in Part I of the policy shows that New Hampshire knew how to include such language where relevant.

The Ninth Circuit recently decided a case involving substantial similar facts. In a concurring opinion, Judge Bea concluded that although the subcontract was executed after the injury, that fact "does not preclude it from extending additional insured coverage to the [subcontractor]." *Am. Guarantee & Liab. Ins. Co. v. Lexington Ins. Co.*, No. 11-17130, 2013 WL 1869144, at *3 (9th Cir. May 6, 2013) (Bea, J., concurring) (unpublished opinion). The insurance policy at issue, like this one, required a written agreement to add an additional insured and also included an exclusion in the contractual liability section for injuries or damages that occurred before execution of the contract. *Id*. Judge Bea wrote: "In light of the difference between the language used in the contractual liability exclusion and the Additional Insured Endorsement, there is no basis on which to extend the requirement in the exclusion to the contractual liability exception that an insured contracted must be executed prior to the liability-producing event to the Additional Insured Endorsement, which requires only a 'written contract.'" *Id*. The Court agrees. Because the additional-insured endorsements to the New Hampshire policy require only a written contract, and do not exclude coverage for events that occur before the contract is signed, the Court concludes that execution of the April 2 contract was effective to make Water Movers an additional insured for purposes of this case.

### C.    New Hampshire's Additional Arguments.

New Hampshire suggests several other arguments under which it allegedly escapes indemnification. New Hampshire contends that: (1) no representative of Knochel ever

actually read the rental agreement, (2) the terms on the back of the rental agreement were unenforceable boilerplate, (3) the terms on the back of the rental agreement provided that Water Movers would be added as an additional insured for the purposes of damage to rental equipment but not for bodily injury, (4) the relationship between the parties is actually governed by a "Master Contract" that conflicts with the rental agreement, (5) the terms of the additional-insured endorsements were not satisfied because Knochel was not engaged in ongoing operations for Water Movers, and (6) an employment exclusion in the New Hampshire policy defeats coverage.   The Court will address each argument.

### 1.    Failure to Read.

In *Condos v. United Ben. Life Ins. Co. of Omaha, Neb.*, 379 P.2d 129, 131-132 (Ariz. 1963) the Arizona Supreme Court held that failure to read a contract does not excuse performance.  New Hampshire argues that Knochel should be excused from this duty to read because the terms and conditions were in small print on the back of the document.  Doc. 98 at 5 (citing *State Farm Mut. Auto. Ins. Co. v. Dimmer*, 773 P.2d 1012 (Ariz. Ct. App. 1988)).  The Court does not agree.  While the relevant condition was on the back of the form and in smaller print, it was not buried or hidden in the midst of a many-page document.  The rental agreement consisted of one page and its terms were relatively simple.  The document states on the front side that it is subject to the terms and conditions on the reverse side.  There is no reason to believe that a sophisticated party like Knochel would be incapable of reading and understanding the agreement.

### 2.    Boilerplate.

For similar reasons, the Court finds that the terms and conditions on the backside of the document were not unenforceable boilerplate.  The Arizona Supreme Court has adopted the Restatement of Contracts approach to the enforcement of boilerplate terms, holding that they should be enforced so long as the other party has no reason to believe "that the party manifesting such assent would not do so if he knew that the writing contained a particular term[.]"  *Darner Motor Sales, Inc. v. Universal Underwriters Ins. Co.*, 682 P.2d 388, 396 (Ariz. 1984) (quoting Restatement (Second) of Contracts

§ 211(3)).   Here, the only proffered reason that Knochel would not agree to the additional-insured condition is because the company believed the relationship between the two parties was governed by a previous agreement.  This argument is not persuasive, for as the Court holds below, the previous agreement did not conflict with the April 2 rental agreement.  Knochel and Water Movers frequently did business, and Water Movers often used the same rental agreement form that was signed on April 2.  The Court finds that the additional-insured condition on the back side of the contract is enforceable.

### 3.   Bodily Injury Covered by Additional Terms.

New Hampshire argues that even if Water Movers was an additional insured, the type of injury sustained in this case was not covered.  New Hampshire contends that the April 2 contract requires Knochel to add Water Movers as an additional insured for purposes of property damage, but not for bodily injury.  While it is true that the relevant clause requires a certificate of insurance that specifies coverage for rental equipment, it also states that: "'Commercial General Liability' with an occurrence limit of at least $1 million must be included.  Water Movers, Inc. its officers directors, members, managers, employees, shareholders, and affiliates must be named as an additional insured and loss payee on all coverages described above."  Doc. 90-3 at 16.  One of the "coverages described above" is general commercial liability coverage, which includes bodily injury.

### 4.   "Master Contract."

In 2005, Knochel and Water Movers executed a "Construction Contract" that purported to "pertain[] to all work to be performed by Subcontractor (Water Movers) for Contractor (Knochel) starting January 1, 2005.  Doc. 92-4 at 18.[2]  The contract also provided that Water Movers, "at its own expense, shall procure, carry, and maintain all of its operations workers' compensation and employer's liability insurance covering all of its employees, public liability and property damage insurance."  *Id* at 21.  The contract set forth minimum coverage limitations for Water Movers' insurance.  *Id*.  The contract also

---

[2] Interstate objects to reliance on the text of the 2005 contract because it believes it was not properly authenticated.  Doc. 93-2 at 2-3.  The Court need not address this objection as consideration of this evidence does not alter the outcome of the case.

1   required Water Movers to add Knochel to its General Liability Policy as an additional
2   insured and specified that the coverage maintained by Water Movers was primary and
3   any coverage maintained by Knochel was non-contributory.  *Id* at 22.  Finally, the
4   contract stated that "[i]n the event of any conflict or inconsistency between the terms and
5   conditions of this Agreement and the terms found on any field tickets, change orders, or
6   proposals, the terms and conditions of this Agreement shall control."  *Id*. at 27.  New
7   Hampshire contends that this 2005 agreement conflicts with and supersedes April 2 rental
8   agreement.

9       The Court rejects this argument for several reasons.  The document New
10  Hampshire calls the "master contract" states that the "subcontractor acknowledges that it
11  is familiar with the scope of the work and specifications required for *the project*[.]"  *Id*. at
12  18 (emphasis added).  The document contains no more information as to what the
13  particular project is, but it does not appear that the project was the tank installation at
14  issue in this case – an installation that occurred four years later.  The reference to a
15  particular project does not support New Hampshire's reading that this contract governed
16  *all* future projects between Knochel and Water Movers.  Furthermore, the contract does
17  not preclude Knochel and Water Movers from entering into different contracts in the
18  future; it merely trumps "field tickets, change orders, or proposals."  To the extent that
19  the terms of this agreement conflict with the terms of the more specific and recent April 2
20  agreement, the terms of the later contract govern.  The Court accordingly finds that this
21  previous agreement does not bar enforcement of the April 2 rental agreement.

22          **5.    Ongoing Operations.**

23      Each of the additional-insured endorsements adds an additional qualification,
24  noting that the third party is only an additional insured for "your [Knochel's] acts or
25  omissions or the acts or omissions of those acting on your behalf in the performance of
26  your ongoing operations for the additional insured."  Doc. 90-4 at 117,127, 143.  New
27  Hampshire contends that when the injury occurred, Knochel was not engaged in ongoing
28  operations on behalf of Water Movers and therefore Water Movers was not an additional

1    insured.

2        Arizona courts have defined liability that arises out of "ongoing operations" as

3    "liability that arises while the work is still in progress."  *Colorado Casualty Ins. Co. v.*

4    *Employers Mut. Cas. Co.*, 288 P.3d 764, 772-73 (Ariz. Ct. App. 2012) (finding that

5    ongoing operations continued from the time a subcontractor installed construction

6    barriers on a site until they were removed).  New Hampshire acknowledges that the

7    equipment rental was ongoing at the time of the accident, but maintains that the use of

8    rental equipment is not ongoing operations *for* Water Movers.  New Hampshire contends

9    that operations are only ongoing for an entity if they are being performed for that entity's

10   benefit.  New Hampshire argues that Knochel's employee was operating Water Movers

11   equipment for Knochel's benefit, not Water Movers', and so his actions were outside the

12   scope of the additional-insured endorsement.

13       The Court is not persuaded.  One of the additional-insured endorsements appears

14   limited to entities for which Knochel agrees to provide construction services.  Doc. 90-4

15   at 143.  This endorsement grants "automatic status" as an additional insured to "any

16   person or entity for whom you [Knochel] are performing operations when you and such

17   person or organization have agreed in writing in a contract or agreement that such person

18   or organization be added as an additional insured on your policy."  *Id.*  This endorsement

19   appears to apply to any entity for which Knochel agrees to perform construction work.

20   Consistent with this reading, the coverage provided by this endorsement "ends when your

21   operations for that additional insured are completed."  *Id.*  In this case, the additional

22   insured described by this endorsement would be the entity for which Knochel was

23   performing grading work near Florence, Arizona, assuming the contract with that entity

24   required additional-insured coverage.

25       The other two endorsements are different.  They do not provide "automatic status"

26   as an additional insured, but instead contain a schedule where the names of the additional

27   insureds are to be provided.  *Id.* at 117, 127.  In one schedule, New Hampshire wrote

28   "BLANKET – WHERE REQUIRED BY WRITTEN CONTRACT."  *Id.* at 117.  In the

1    other, it wrote "BLANKET AS REQUIRED BY WRITTEN CONTRACT."  *Id.* at 127.

2    These blanket endorsements provide additional-insured coverage to any entity whose

3    contract with Knochel requires such coverage.  Such entities are not limited like the third

4    endorsement to entities for which Knochel contracts to perform construction services;

5    they would include subcontractors Knochel hires to provide part of the service Knochel is

6    obligated to provide – subcontractors such as Water Movers.

7            The second of these blanket endorsements provides additional detail.  It states in

8    the schedule that "SUCH INSURANCE AS IS AFFORDED BY THE POLICY *FOR*

9    *THE  BENEFIT  OF  THE  ADDITIONAL  INSURED*  SHALL  BE  PRIMARY

10   INSURANCE."  *Id.* at 127 (italics added).  Both of the endorsements also state that the

11   additional-insured coverage ends when the work "to be performed *by or on behalf of* the

12   additional insured(s) . . . has been completed."  *Id.* at 117, 127 (emphasis added).  These

13   terms suggest that the coverage is for the benefit of entities which contract with Knochel

14   and  require  coverage,  and  that  the  coverage  applies  not  just  to  work  performed  by

15   Knochel for that entity, but also to work performed "by" that entity.   Water Movers was

16   still performing its work – providing water equipment at the job site – when the accident

17   occurred in this case.

18           Because these two blanket endorsements apply by their terms to entities which

19   contract with Knochel for additional-insured coverage, because the clear intent of the

20   endorsement is to provide coverage "for the benefit" of such entities, and because the

21   endorsement ends when work performed "by or on behalf of" such entities is completed,

22   that Court cannot conclude that the endorsements apply only in those situations where

23   Knochel is providing services for the other entity.  Such a reading places too much

24   weight on the single word "for," and is inconsistent with the remainder of the blanket

25   endorsements.   The third endorsement clearly is limited to entities "for whom you

26   [Knochel] are performing operations," but the other two blanket endorsements are

27   broader.   The Court accordingly holds that these endorsements are not limited to

28   situations where Knochel was working for Water Movers.

1    This conclusion finds support in the Arizona law which provides that ambiguous

2    insurance contracts – like the first two endorsements – are to be interpreted "by looking

3    to legislative goals, social policy, and the transaction as a whole."  *First Am. Title Ins.*

4    *Co. v. Action Acquisitions, LLC*, 187 P.3d 1107, 1110 (Ariz. 2008).   Considering the

5    intent of the additional-insured endorsements and the transaction as a whole, the Court

6    finds the interpretation reached above to be appropriate.  And even if the Court were to

7    find the endorsements ambiguous after considering the *Action Acquisitions* factors, such

8    ambiguity would be construed against New Hampshire.  *Id.*

9              **6.       Employer Liability Exclusion.**

10   New Hampshire argues that the policy's exclusion of employer liability bars

11   coverage in this case.  Doc. 90-4 at 101.  The relevant portion of the policy states:

12   2.    Exclusions

13         This insurance does not apply to:

14         …

15         e.    Employer's Liability

16               Bodily injury to:

17                     (1)    An employee of the insured arising out
                             of and in  the  course of:
18
19                            (a)    Employment by the insured; or

20                            (b)    Performing duties related to the
                                    conduct of the insured's business
21         …

22               This exclusion applies whether the insured may be liable as
                an employer or in any other capacity and to any obligation to
23              share damages with or repay someone else who must pay
                damages because of the injury.  *Id.*
24

25   New Hampshire argues that Knochel is the insured under this clause and that the

26   exclusion applies because the employee who was injured worked for Knochel.  Interstate

27   twice acknowledges that Knochel is "the insured" under this exclusion (Doc. 93 at 19;

28   Doc. 95 at 14), but argues that "[b]ecause Mr. Brown was not an employee of Water

- 13 -

1   Movers, the exclusion does not apply to Water Movers" (Doc. 93 at 19).  The Court
2   cannot agree with Mater Movers.

3   Simplified, this provision states that the insurance policy "does not apply" to
4   "[b]odily injury" to "an employee of the insured arising out of and in the course of"
5   "[e]mployment by the insured[.]"  Doc. 90-4 at 101.  The facts invoking this provision
6   are not disputed:  Interstate concedes that Knochel is "the insured" referred to in this
7   provision, Mr. Brown was an employee of Knochel when the accident occurred, Mr.
8   Brown suffered bodily injury, and Mr. Brown was acting in the course of his employment
9   for Knochel.  By the plain terms of this exclusion, the "insurance does not apply" to Mr.
10  Brown's injury.  *Id.*

11  Interstate claims support for its position in *Farmers Ins. Group v. Home Indem.*
12  *Co.*, 493 P.2d 909, 911 (Ariz. 1979).  In *Farmers*, an employee of Rite-Way Ventilating
13  Company, Juan F. Espinoza, was killed while assisting a crane operator load a truck.  *Id.*
14  at 910.  The crane was operated by Paul C. Daly who was working as an independent
15  contractor.  Daly was insured by Farmers; Rite-Way owned the truck and was insured by
16  Home Indemnity Company ("Home").   *Id.*  Espinoza's surviving spouse brought a
17  wrongful death suit against Daly, and Farmers defended.  *Id.*  Home refused to defend.
18  *Id.* Despite its insurance of the truck, Home denied coverage on the basis of an exception
19  in the policy for bodily injury to any employee of the insured in the course of
20  employment.  *Id.* at 911.  Farmers argued that the employment exclusion should not
21  apply to Daly because Daly was "an insured" under the policy but not "the insured."  *Id.*

22  The court considered these arguments against the backdrop of Arizona's Financial
23  Responsibility Act, A.R.S. §§ 28-4001 to 4153, the purpose of which is to protect the
24  public from "the financial hardship resulting from the use of automobiles by financially
25  irresponsible persons."  *Farmers*, 493 P.2d at 911 (citing *Jenkins v. Mayflower Insurance*
26  *Exchange*, 380 P.2d 145 (Ariz. 1963)).  Ultimately, the court concluded that "public
27  policy would be thwarted by holding that the exclusion will be applied where a person is
28  injured by a third party insured by the owner because he is an employee of the owner."

1   *Id.* at 912.  Although the purpose of the employment exclusion was to "protect the owner
2   from the expense of double coverage where his employee is covered by workmen's
3   compensation," the court held that the application of "the exclusion without limitation to
4   defeat coverage of third parties frustrates the purpose of the Financial Responsibility
5   Act." *Id.*

6       *Farmers* rested on the policies of the Financial Responsibility Act.  The purpose of
7   the Act is to protect "[t]he public using the highways . . . from financial hardship
8   resulting from the use of automobiles by financially irresponsible persons." *Schwab v.*
9   *State Farm Fire & Cas. Co.,* 558 P.2d 942, 944 (Ariz. Ct. App. 1976).  Because this case
10  involves neither automobiles nor the public's use of the highways, the policies of the Act
11  are not relevant.

12      Interstate contends that *Farmers* stands for the proposition that the phrase "the
13  insured" can only refer to the insured employer and that they, like Daly, are the "non-
14  employer" who seeks coverage for the employee's injuries.  Doc. 93 at 20.  This
15  argument misstates the holding in *Farmers*.  As noted above, *Farmers* was based entirely
16  on the Financial Responsibility Act.  *Farmers* did not adopt the holding Interstate
17  espouses, but merely mentioned it as hypothetical: "*If* we were to construe the Home
18  Indemnity policy to mean that the exclusion does not have application to the permissive
19  insured because the injured or deceased was an employee of the owner insured, [the
20  court] would be compelled to hold . . . that the exclusion was void as against public
21  policy." *Farmers*, 493 P.2d at 912 (emphasis added).  The Court cannot conclude that
22  the mere mention of this hypothetical constitutes a basis on which to disregard the clear
23  language of the policy and the undisputed facts that render it applicable in this case.

24      In summary, the Court finds that the clear language of the employer liability
25  exclusion applies to the undisputed facts of this case.  Although Water Movers qualifies
26  as an additional insured, the plain language of the employment exclusion policy bars
27  indemnification under the policy.  Doc. 90-4 at 101.

28

- 15 -

**IT IS ORDERED:**

**1.**    Plaintiff Interstate's motion for summary judgment (Doc. 90) is **denied.**

**2.**    Defendant New Hampshire's motion for summary judgment (Doc. 92) is **granted.**

**3.**    The Clerk shall terminate this action.

Dated this 4th day of September, 2013.

David G. Campbell
United States District Judge